# Supreme Court of Texas

No. 24-0325

In re The State of Texas,

*Relator*

On Petition for Writ of Mandamus

JUSTICE BLACKLOCK delivered the opinion of the Court.

Harris County intends to use federal funds to "provide no-strings-attached $500 monthly cash payments to 1,928 Harris County residents for 18 months."[1] Recipients would be chosen by lottery from among applicants with income below 200% of the federal poverty line who live in certain zip codes, among other criteria. Harris County has identified roughly 55,000 eligible applicants, which means the likelihood of any particular entrant succeeding in the lottery is roughly 3.5%.

The State of Texas contends this arrangement is unconstitutional in multiple ways, including that it violates the Texas Constitution's bar on "gratuitous payments to individuals." *Tex. Mun. League*

---

[1] *Frequently Asked Questions*, UPLIFT HARRIS, https://uplift.harriscountytx.gov/FAQs (as of May 22, 2024). A screenshot of this statement appears in the record, but the website has since been altered.

*Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002); TEX. CONST. art. III, § 52(a). The State sued the County, seeking an injunction blocking implementation of the proposed program, which the County calls "Uplift Harris." The State immediately sought a temporary injunction, which the district court denied. The State appealed the denial of the temporary injunction and asked the court of appeals for a Rule 29.3 order staying payments under the Uplift Harris program while its temporary-injunction appeal proceeds. *See* TEX. R. APP. P. 29.3 (authorizing "temporary orders necessary to preserve the parties' rights"). The court of appeals denied that request, and the State sought mandamus relief in this Court.

The State's mandamus petition asks this Court to require the court of appeals to issue a Rule 29.3 order staying all Uplift Harris payments while the State's temporary-injunction appeal proceeds. Together with its mandamus petition, the State filed a motion for temporary relief pursuant to Rule 52.10, seeking an immediate stay of Uplift-Harris payments. *See id.* 52.10(b) (authorizing an appellate court to "grant any just relief pending the court's action on the [mandamus] petition"). We administratively stayed[2] the payments, without regard to the merits, pending our consideration of the State's

---

[2] "Administrative stays do not typically reflect the court's consideration of the merits of the stay application. Rather, they 'freeze legal proceedings until the court can rule on a party's request for expedited relief.'" *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of applications to vacate stay) (quoting Rachel Bayefsky, *Administrative Stays: Power and Procedure*, 97 NOTRE DAME L. REV. 1941, 1942 (2022)).

2

motion for temporary relief. *See id.* That motion, which Harris County opposes, is now before this Court. For the following reasons, the motion is granted, and all payments under the Uplift Harris program are prohibited pending further order of this Court.

The State's appeal of the denial of a temporary injunction remains pending in the court of appeals, which we expect will proceed expeditiously to a decision. That decision can, if desired, be appealed to this Court. The State's mandamus petition will remain pending in this Court while its appeal proceeds below.

* * *

In a mandamus proceeding in the Supreme Court or a court of appeals, "[t]he relator may file a motion to stay any underlying proceeding or for any other temporary relief pending the court's action on the petition." TEX. R. APP. P. 52.10(a). Whether in response to such a motion by the relator, in response to a motion by any other party, or "on its own initiative," the court may "grant any just relief pending the court's action on the petition." *Id.* 52.10(b). Absent a contrary order, relief ordered under Rule 52.10 remains in effect "until the case is finally decided." *Id.*

In an appeal—as opposed to a mandamus proceeding—the closest analogue to Rule 52.10 is Rule 29.3, which authorizes a court of appeals to "make any temporary orders necessary to preserve the parties' rights until disposition of the appeal." *Id.* 29.3. When a court of appeals grants or denies a motion for temporary relief under Rule 29.3, the rules provide no direct mechanism for immediate appeal of that ruling to this Court. As we have recognized in past cases, however, a party may seek mandamus relief in this Court challenging a court of appeals' decision

3

on Rule 29.3 temporary relief. *See, e.g.*, *In re State*, No. 21-0873, 2021 WL 4785741 (Tex. Oct. 14, 2021). In so doing, the party may request immediate temporary relief under Rule 52.10. *Id*. In this way, when time is of the essence, a party may ask this Court to intervene to determine the parties' rights during the pendency of the underlying appeal.

When considering such a request in the past, we have described our exercise of authority under Rule 52.10 as a way to "preserve the status quo" while the appeal proceeds. *Id*. at \*1. While "preservation of the status quo" has long been a valid consideration when courts are asked to issue temporary relief, the terminology is not without its drawbacks. Identifying the status quo is not always a straightforward undertaking, after all. In this case, for instance, Harris County claims the status quo is its previously unchallenged freedom to implement the Uplift Harris program as it sees fit. From that perspective, the State's motion seeks to alter the status quo. On the other hand, the State claims the status quo is that the funds have not yet been disbursed. If that is right, then the State's motion seeks to preserve the status quo. Such debates about how to define the status quo can descend quickly into lawyerly word-play, offering little help to a court tasked with providing "just relief." TEX. R. APP. P. 52.10(b).

Rather than describe the purpose of relief under Rule 52.10 as "preservation of the status quo," we find Rule 29.3's analogous formulation more helpful. An appellate court asked to decide whether to stay a lower court's ruling pending appeal or to stay a party's actions while an appeal proceeds should seek "to preserve the parties' rights

4

until disposition of the appeal." *Id.* 29.3. The equitable authority we exercise today, under Rule 52.10, serves the same purpose—preservation of the parties' rights while the appeal proceeds. A stay pending appeal is, of course, a kind of injunction, so the familiar considerations governing injunctive relief in other contexts will generally apply in this context as well. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 65.011 (listing requisites for writs of injunction); *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 792 (Tex. 2020) (listing requisites for permanent injunctive relief).

To begin with, an appellate court can hardly endeavor to preserve the parties' rights pending appeal without making a preliminary inquiry into what those rights are. Thus, the likely merits of the parties' respective legal positions are always an important consideration when a court is asked to issue an order determining the parties' legal rights pending appeal. There is little justice in allowing a party who will very likely lose on the merits to interfere with the legal rights of the opposing party during the appeal, if this can be avoided. Likewise, it may often be unjust to require a party who is very likely to succeed on the merits to wait for the lengthy appellate process to play out before exercising his legal rights.

Consideration of the merits of the parties' legal positions commonly informs a court's assessment of the advisability of injunctive relief. *See* TEX. CIV. PRAC. & REM. CODE § 65.011(1) (asking whether "the applicant is entitled to the relief demanded"); *Pike*, 610 S.W.3d at 792 (requiring showing of "a wrongful act"). The relevance of the merits to requests for injunctive relief does not vanish when courts must rule

5

expeditiously. To the contrary, trial courts asked to issue temporary injunctions or temporary restraining orders commonly must consider the likely merits of the parties' positions. *See Abbott v. Harris County*, 672 S.W.3d 1, 8 (Tex. 2023) (temporary injunction); *In re Abbott*, 628 S.W.3d 288, 291 (Tex. 2021) (temporary restraining order). In a similar way, appellate courts asked to issue temporary relief pending appeal should make a preliminary inquiry into the likely merits of the parties' legal positions. The merits need not—and often should not—be definitively determined at this preliminary stage, but "just relief" that "preserve[s] the parties' rights" cannot be afforded without some consideration of the merits.

Another essential consideration attendant on any request for injunctive relief, including in this posture, is the injury that will befall either party depending on the court's decision. As in the underlying temporary-injunction context, the applicant for a stay pending appeal should be expected to show that he will suffer irreparable harm if relief is not granted. Courts must likewise consider the harm that other parties or the public will suffer if relief is granted—as well as any potential injury to non-parties caused by granting or denying relief. The equitable balancing of these harms is a required aspect of a court's effort to preserve the parties' rights pending appeal. *See Huynh v. Blanchard*, ___ S.W.3d ___, 2024 WL 2869423, at *24–25 (Tex. June 7, 2024).

While the likely merits and the balance of harms are two required considerations in every case in this posture, we do not foreclose consideration of other matters, depending on the circumstances. A stay pending appeal is a creature of equity, and a court asked to issue one

6

may take into account other case-specific equitable considerations that bear on its exercise of discretion.[3]

\* \* \*

Applying this standard here, we conclude that the State's motion for temporary relief should be granted. Although we make no definitive statement about the merits, the State has raised serious doubt about the constitutionality of the Uplift Harris program, and this potential violation of the Texas Constitution could not be remedied or undone if payments were to commence while the underlying appeal proceeds.

Article III, section 52(a) of the Texas Constitution provides that "the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever." The Constitution contains other similar statements. *See* TEX. CONST. art. III, §§ 50 (prohibiting the giving or lending of credit of the State to persons and entities), 51 (prohibiting grants of public money to individuals and others); *id.* art. XI, § 3 (prohibiting local governments from making "any appropriation or donation" to private entities); *id.* art. XVI, § 6(a) (prohibiting any "appropriation for private or individual purposes").

---

[3] "The principles governing courts of equity govern injunction proceedings if not in conflict with this chapter or other law." TEX. CIV. PRAC. & REM. CODE § 65.001; *see also In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136, 138 (Tex. 2004) (noting that mandamus review is "largely controlled by equitable principles" and hence it "resists categorization," requires "flexibility that is the remedy's principal virtue," and includes considerations that "implicate both public and private interests"); *In re Gamble*, 71 S.W.3d 313, 317 (Tex. 2002) (noting that courts exercising equity jurisdiction must "among other things, balance competing equities").

Under this Court's precedent interpreting these provisions, a government in Texas that desires to dole out public funds must, among other things, "retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment." *Tex. Mun. League*, 74 S.W.3d at 384.

The record indicates that Uplift Harris has advertised a "no strings attached" stipend to those lucky enough to win its lottery. It appears there will be no public control over the funds after they are disbursed. It likewise appears there will be no monitoring of the recipients' day-to-day purchases, so it is unlikely the County will know how recipients spend the money and whether any legitimate public purpose was achieved thereby. The application states that funds must not be used for terrorism, fraud, or other nefarious activities, but we are given no indication that the County intends to, or even could, meaningfully enforce these restrictions or truly monitor the recipients' expenditures. Indeed, a County official testified that the program is not designed "to monitor what people do with the things they buy."

This is quite unlike a food-stamp program, a housing voucher, or a medical-care program, in which the public funds can only be directed to their intended purpose. It appears that, for all practical purposes, there truly are "no strings attached," and we are directed to no precedent indicating that a government in Texas may make such payments without running afoul of our Constitution's restrictions. At this preliminary stage, the State has raised serious doubt that the Uplift

8

Harris program can satisfy the "public control" requirement of this Court's Gift Clause precedent.

The County argues, in the alternative, that the Uplift Harris program qualifies as "economic development" and is therefore separately authorized by article III, section 52-a of the Texas Constitution—even if the program otherwise violates the Gift Clauses. Under section 52-a, "the legislature may provide for the creation of programs and the making of loans and grants of public money . . . for the public purposes of development and diversification of the economy of the state." TEX. CONST. art. III, § 52-a. We have not previously decided a case involving section 52-a. Without foreclosing further development of the County's argument, we are skeptical of the County's position at this preliminary stage.

Under the County's permissive reading of section 52-a, nearly any direct gift of public money that will likely be spent by the recipient could qualify as "economic development"—on the theory that any boost in overall consumer spending is good for the economy. If this is right, then section 52-a comes close to repealing the Gift Clauses' ban on "gratuitous payments to individuals." *Tex. Mun. League*, 74 S.W.3d at 383. Such payments could nearly always be portrayed as good for the economy in some sense.

Without resolving the issue, we think it more likely that by authorizing "grants of public money . . . for the public purposes of development and diversification of the economy of the state," section 52-a removed doubt about the constitutionality of conventional economic-development grants, by which governments promote business

9

growth and job creation through grant agreements designed to ensure that the recipient of public funds spends them in a way that has an economic benefit for the wider community. In other words, section 52-a appears designed to clarify that "development and diversification of the economy of the state" qualify as "public purposes." We remain skeptical of the County's argument that a program of unmonitored, "no strings attached" cash payments to individuals serves "the public purposes of development and diversification of the economy of the state" as envisioned by section 52-a.

Turning to the balance of harms, we have recognized that "*ultra vires* conduct" by local officials "automatically results in harm to the sovereign as a matter of law." *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020). Indeed, the violation of duly enacted state law by local government officials "clearly inflicts irreparable harm on the State." *Tex. Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 441 (Tex. App.— Austin 2018, pet. denied) (quoting *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018)). We have likewise recognized that the State has a "justiciable interest in its sovereign capacity in the maintenance and operation of its municipal corporations in accordance with law," and that "[a]s a sovereign entity, the State has an intrinsic right to . . . enforce its own laws." *Hollins*, 620 S.W.3d at 410 (quoting *Yett v. Cook*, 281 S.W. 837, 842 (Tex. 1926) and *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015)).[4]

The harm alleged here is irreparable in an additional sense as well. Once the funds are distributed to individuals, they cannot feasibly

---

[4] To the extent the County challenges the State's standing to bring this suit, our recognition in *Hollins* and elsewhere that the State has a justiciable

10

be recouped if it is later determined they were paid in violation of the Texas Constitution. The parties do not seem to disagree on this reality.

As for injury to other parties, the County itself will suffer no cognizable injury unless its legal rights are incorrectly circumscribed during the pendency of the appeal. The County is not harmed by being required to follow the Texas Constitution. Again, it remains possible the County will ultimately succeed on the merits. But we must judge the likely harm to the County's legal rights in light of our preliminary assessment of the merits, which does not favor the County.

As for harm to the public, in general the citizens of Harris County are not harmed by requiring the County to abide by the Texas Constitution. A very small percentage of Harris County citizens will temporarily be denied receipt of the disputed payments if a stay is granted. But if those payments would have been illegal, then the temporary denial of them is not a harm that can tip the scales in the County's favor. Requiring the government to follow the law benefits everyone. Temporarily preventing expenditure of these funds while the State's appeal proceeds ensures public funds are not irrecoverably spent in violation of the Texas Constitution. Whether Harris County's proposal would actually violate the Texas Constitution remains an open question at this early stage of the litigation.

\* \* \*

For these reasons, the State's Rule 52.10 motion is granted. Harris County is ordered to refrain from distributing funds under the

---

interest in assuring that its political subdivisions comply with Texas law sufficiently establishes the State's standing at this juncture.

Uplift Harris program until further order of this Court.[5]  The court of appeals should proceed to decide the temporary-injunction appeal now pending before it.  The State's petition for writ of mandamus remains pending in this Court.

James D. Blacklock
Justice

**OPINION DELIVERED:** June 14, 2024

---

[5] The County states that, under federal requirements, it must spend the funds by September 30, 2026, but it must "commit" funds to Uplift Harris by December 31, 2024.  The precise nature of what constitutes "committing" funds is not entirely clear, but the State does not ask us to prevent the County from earmarking or assigning federal funds to the program.  Today's stay prevents the County from disbursing the funds to individual recipients or to third-party intermediaries until further order of this Court.